## Case No. 8,271.

### LE ROY v. JAMISON et al.

[3 Sawy. 369;[1] 2 Cent. Law J. 685; 1 Law & Eq. Rep. 52.]

Circuit Court, D. California. June 23, 1875.

AUTHORITY OF COMMISSIONER OF THE GENERAL LAND OFFICE—FINAL SURVEY OF MEXICAN LAND GRANT — PUBLICATION OF NOTICE — PLACE OF PUBLICATION DEFINED—NOTICE—WHAT IT MUST STATE — CLERK'S CERTIFICATE—OF WHAT EVIDENCE—COMMISSIONER'S DECISION—EFFECT OF—ACCEPTANCE OF PATENT—PATENT WHEN IN CONDITION FOR ACCEPTANCE — OFFICERS' POWERS CEASE WITH RECORD OF PATENT—WHEN PRIOR APPLICATION FOR PATENT EVIDENCE OF ACCEPTANCE—ACCEPTANCE OF PATENT WAIVER OF OBJECTIONS.

1. Previous to the act of June 14, 1860 [12 Stat. 33], vesting jurisdiction in the district court of the United States for California, over surveys of confirmed Mexican land claims, the commissioner of the general land office exercised a general supervision and control of all executive duties relating to private claims to land, and the issuing of patents therefor. Such authority was vested in him by the act of July 4, 1836 [5 Stat. 107], reorganizing the general land office. It embraced the examination of all surveys of such private claims and their correction until made conformable with the right conferred upon the claimant by legislative act or judicial decree. This authority continues under the act of 1864 [13 Stat.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

332]. By the act of 1860, and so long as that act was in force, his power in this respect was withdrawn. That act established a system by which all surveys, when made pursuant to its requirements, and advertised in a certain way, became so far final as to leave to the commissioner the simple ministerial duty of issuing patents thereon. The course of procedure in such cases stated.

2. To render a survey final under the act of 1860, when not submitted to the district court, it was necessary that the publication required should be made, and though in issuing a patent upon a survey when final, the commissioner had a mere ministerial duty to perform, there was this preliminary duty cast upon him to see that the necessary publication had been made. The certificate of the surveyor-general was only prima facie evidence of the fact.

3. By the language "place of publication." in the statute of 1860, requiring the surveyor-general to give notices of surveys made by him by publication once a week for four weeks in two newspapers, one of which was to be in a paper where the "place of publication" was nearest to the land, reference is had to the place where the paper is first issued; that is, given to the public for circulation, and not to the place where the paper is subsequently distributed.

4. A notice published by the surveyor-general that he had examined and approved, under the act of 1860, of a particular rancho confirmed to designated parties. is not a compliance with the law requiring publication of notice that he had caused a survey and plat to be made of —— land confirmed; or had approved of one made by others under his direction.

5. The clerk of the United States district court can certify to copies of papers and orders in his office; also, perhaps, to the absence of papers and orders in particular cases. His certificate is not evidence of any other facts stated therein.

6. The determination of the commissioner, upon receiving a survey transmitted to him as published, under the act of 1860, as to the regularity and sufficiency of the alleged publication, is conclusive, unless reviewed and corrected on appeal by the secretary of the interior. The right of the commissioner. upon proper application, to reconsider any matter previously determined by him, must be exercised before proceedings upon the original ruling have been taken and concluded.

7. No one can be compelled by the government to become a purchaser, or even to take a gift. In order that the patent of the government may take effect as a conveyance, so as to bind the party to whom it is executed, and transfer the title to him, it is essential that it should be accepted. The acceptance by the grantee of the conveyance, where no personal obligation is imposed, will always be presumed in the absence of express dissent, whenever the conveyance is placed in a condition for acceptance.

[Cited in Alvarado v. Nordholt, 95 Cal. 121, 30 Pac. 213.]

8. The deed of the government. that is its patent, is in a condition for acceptance when the last formalities required by law of the officers of the government are complied with. Those formalities consist in passing the instrument under the seal of the United States, and in recording it in the records of the land office. The record stands in the place of the offer or delivery in the case of a private deed; the instrument is thenceforth held for the grantee.

[Cited in U. S. v. Schurz, 102 U. S. 399.]
[Cited in Cruz v. Martinez, 53 Cal. 243.]

9. With the record of the patent the power of the officers of the government over the instrument is gone. Whether it thereafter remain in the land office, or be transmitted to a local officer for manual delivery to the patentee, its validity and operation are unaffected. Its acceptance by the grantee will then be conclusively presumed,

unless immediately upon knowledge of its issue, his refusal to accept it is explicitly declared, and such refusal is communicated to the land office.

10. A previous application for a patent is evidence of its acceptance if the patent conforms to the application. Patents issued upon confirmation of Mexican grants in California are of this character. To obtain them is the object of the proceedings instituted under the act of 1851, and when a patent is issued in conformity with proceedings regularly taken under the act, it takes effect without reference to any subsequent action of the patentee. But if the patent be issued without a final survey conformable to the decree, its acceptance cannot be conclusively presumed, from the fact that the patentee instituted the proceedings for the confirmation of his claim. He can in such case, by prompt expression of dissent, communicated to the proper department, prevent the patent becoming so far binding upon him as to preclude a re-examination of the survey as to the errors alleged.

11. Objections by the patentee to the survey of a confirmed Mexican land claim are waived by his acceptance of the patent.

This was an action to recover the possession of certain real property in the county of Santa Barbara, and by stipulation, was tried by the court without the intervention of a jury. Both parties claimed the demanded premises under patents of the United States, issued upon the confirmation of grants of the former Mexican government. Both patents covered the demanded premises. The patent under which the plaintiff [Theodore Le Roy] claimed bears date in March, 1870, and the grant upon which it is founded was made in March, 1840. The patent under which the defendants [Tobias B. Jamison and others] claimed bears date in October, 1873, and the grant upon which it rests was issued in December, 1844. The plaintiff, having the earlier patent and the elder grant, was entitled to recover, unless the validity of the patent, or the correctness of the survey of the premises covered by it was successfully assailed. The defendants contended that the patent was invalid and that the survey was incorrect. In support of their position that the patent was invalid, they produced the opinion and decision of Commissioner Drummond, of the general land office, made in June, 1872, directing a cancellation of the patent, and the decision of the secretary of the interior, affirming his action. The following is Commissioner Drummond's opinion:

"Department of the Interior, General Land Office, Washington, D. C., June 12, 1872. Sir: I have carefully examined the papers in the case of the Rancho Guadalupe, Diego Olivera and Teodore Arellanes confirmees, granted by Juan B. Alvarado, March 21, 1840, confirmed by the board of land commissioners for California December 6, 1853, and by the United States district court, September 25, 1855, and appeal dismissed February 5, 1857. Under instructions dated January 15, 1858, from J. W. Mandeville, United States surveyor-general for California, United States Deputy Surveyor Brice M. Henry made a survey of this rancho; but, a protest against said survey

having been filed July 6, 1859, by Diego Olivera, it was set aside and a re-survey ordered, which re-survey, containing 32,408.03 acres, was made in September, 1860, by United States Deputy Surveyor J. E. Terrell, and the survey and plat approved by Surveyor-General Mandeville on the twenty-ninth of January, 1861. This survey was, on the thirty-first of May, 1861, certified by said surveyor-general to have been published, for four successive weeks in the Santa Barbara Gazette, the first publication being on the fourteenth of February, 1861, and the last on the seventh of March, 1861; and also in the Los Angeles Star, the first publication being on the twenty-third of February, 1861, and the last on the sixteenth of March of the same year, the form of said publication being as follows, as shown by a copy certified, in 1870, by United States Surveyor-General Sherman Day:

" 'United States Surveyor-General's Office, San Francisco, February 12, 1861. In compliance with the first section of an act of congress approved June 14, 1860 [12 Stat. 33], regulating surveys of private land claims, surveyed in pursuance of the thirteenth section of an act entitled "An act to ascertain and settle private land claims in the state of California," approved March 3, 1851 [9 Stat. 631], have been examined and approved by me.

" 'Name of rancho, Guadalupe.

" 'Confirmee, Diego Olivera et al.

\*    \*    \*    \*    \*    \*    \*

" 'The plats will be retained in this office subject to inspection for four weeks from the date of this publication.

" 'James W. Mandeville,

" 'United States Surveyor-General.'

"On the twenty-third of May, 1863, John W. Wheeler, clerk of the United States district court for the Southern district of California, certified 'that due notice by publication, in manner and form as required by law, has been made by the surveyor-general of the United States for the state of California, in the matter of the approved survey of the lands called "Guadalupe," confirmed to the claimant in the above-entitled cause of Diego Olivera v. U. S.,' and 'that the full period of six months from and after the completion of said publication has elapsed, and no objections having been made thereto or filed in my office, the said approved survey has become final, and the claimant therefore entitled to a patent for the land therein contained.' In the same year E. F. Beale, then United States surveyor-general for California, transmitted to this office a copy, duly certified, May 25, 1863, of the plat, field-notes, and other documents in the case, as a basis for the issue of a patent, and in those papers the surveyor-general, after stating that the rancho under consideration had been surveyed in conformity with the grant and decree of confirmation, continues as follows:

" 'I do hereby certify the annexed map to

be a true and accurate plat of the said tract of land as appears by the field notes of the survey thereof made by J. E. Terrell, deputy surveyor, in the month of September, 1860, under the direction of this office, which, having been examined and approved, are now on file therein. And I do further certify that in accordance with the provisions of the act of congress approved on the fourteenth day of June, 1860, entitled "An act to define and regulate the jurisdiction of the district courts of the United States in California in regard to the survey and location of confirmed private land claims," I have caused to be published once a week, for four weeks successively, in two newspapers, to-wit, the Santa Barbara Gazette, published in the county of Santa Barbara, being the newspaper published nearest to where the said claim is located, the first publication being on the fourteenth day of February, 1861, and the last on the seventeenth day of March, 1861; also, in the Los Angeles Star, a newspaper published in the city and county of Los Angeles, the first publication being on the twenty-third day of February, 1861, and the last on the sixteenth day of March, 1861, a notice that the said claim had been surveyed, and a plat made thereof and approved by me. And I do further certify that the said approved plat and survey was retained in this office during all of said four weeks, and until the expiration thereof, subject to inspection. And I do further certify that no order for the return thereof to the United States district court has been served upon me. And I do further certify that, under and by virtue of the said confirmation, survey, decree and publication, the said Diego Olivera et al. are entitled to a patent from the United States upon the presentation thereof to the general land office for the said tract of land bounded and described as follows, to-wit: (Here follows the field-notes of the Terrell survey.)'

"It appears from the foregoing that the Rancho Guadalupe was properly and finally confirmed, and that it was surveyed by Henry, objected to, and re-surveyed by Terrell in September, 1860. Surveyors-General Mandeville and Beale certify that the plat and field-notes thereof were approved in January, 1861, and duly published, according to law, in the months of February and March of the same year in the Santa Barbara Gazette and the Los Angeles Star; and the clerk of the United States district court for Southern California certifies, in his official capacity, that all the requisites of the law had been complied with, and that the survey of the Rancho Guadalupe was final by publication under the act of 1860.

"So far, therefore, as the official records of the surveyor-general's office and courts show, the survey was final. It was so considered by this office, and a patent in accordance therewith, dated June 30, 1866, was prepared, signed and recorded, and sent to the United States surveyor-general for California on the second of August, 1866; but said patent was never delivered, the then owner of the rancho, John B. Ward, refusing to accept the same, alleging that the Terrell survey did not conform to the decree of confirmation, and also that it was not final under the act of June 14, 1869 (12 Stat. 33), the requirements of that act with respect to publication never having been complied with. In this protest Mr. Ward alleges that 'on the twenty-ninth day of January, 1861, the said surveyor-general filed in his said office an approval of the field-notes and plat of the said rancho, and that subsequently to such filing no publication of the notice of the approval was made in accordance with the provisions of the act of congress of June 14, 1860, already recited.' 'That it is true that a notice of the approval of a plat of survey of a certain tract of land, known by the name of Guadalupe, was published in the Los Angeles Star, the first publication thereof being on the twenty-ninth of September, 1860, and the last on the twentieth of October, 1860; also, in the Pacific Sentinel, the first publication thereof being on the twenty-first of September, 1860, and the last on the twelfth of October, 1860; but the field-notes and plat of the rancho, which is the subject of the present memorial, not having been approved until the twenty-ninth of January, 1861, the publication above referred to could have had no application thereto, so that, in point of fact, no publication of the approval by the surveyor-general of the field-notes and plat of the survey of the Guadalupe rancho, granted to Diego Olivera and Teodore Arellanes, has ever been made according to law.'

"In support of these allegations, there were filed three affidavits:

"First. An affidavit signed by John Nugent, one of Mr. Ward's counsel, in which it is stated that up to July, 1866, no other plat of the Guadalupe was ever exhibited or on file as the official plat approved by J. W. Mandeville, except one with the following inscription:

" 'Note.—A notice of the approval of this plat of survey has been published in accordance with the act of congress of June 15, 1860, in the Los Angeles Star, the first publication thereof being on the twenty-ninth of September, 1860, and the last on the twentieth of October, 1860; also, in the paper nearest the land, being the Pacific Sentinel, the first publication thereof being on the twenty-first of September, 1860, and the last on the twelfth of October, 1860. This plat has remained in this office subject to inspection from the date of the approval thereof.'

"Second. An affidavit signed by Vicente A. Torras, who was employed on the Santa Barbara Gazette, in January and February, 1861, and who swears that in those months said paper was published in San Francisco.

"Third. An affidavit, signed by S. B. Brinkerhoff, in which it is stated that said affiant

'was a subscriber to a paper known as the Santa Barbara Gazette, and that of his own knowledge the place of publication of said paper was in the city of San Francisco, and not in the county of Santa Barbara.'

"Upon these affidavits, this office decided, in letter dated October 22, 1866, addressed to the United States surveyor-general for California, that the publication was not in conformity with the law of 1860, and was, therefore, void. A new survey was ordered, made, and subsequently published under the act of 1864, approved by the commissioner of the general land office, and patent issued in accordance therewith, which patent was sent to the surveyor-general's office, but recalled before delivery.

"Although two witnesses, Torras and Brinkerhoff, swear positively that the Santa Barbara Gazette was, in February and March, 1861, published in San Francisco, Doña Longina Yriarte de .Torras, widow of V. I. Torras, one of the publishers in 1861 of the Santa Barbara Gazette, swears that from January 1 to October 17, 1861, said paper was printed at San Francisco, and as soon as printed sent to Santa Barbara for distribution; and M. W. Kimberly testified that during the years 1860 and 1861, there was no paper published in Santa Barbara county, except the Santa Barbara Gazette. There is also filed with these affidavits a copy of said paper, headed as follows: 'Santa Barbara Gazette. Organo de la Poblacion Española en California. Santa Barbara, Jueves, 17 de Octubre de 1861.' It would seem, therefore, that said paper was printed at San Francisco, but distributed at Santa Barbara, and that Torras and Brinkerhoff must be understood as' testifying in effect that in their opinion the place of printing and publication must be identical. With their conclusions, which seem to have materially affected the opinion of this office when the publication of the Terrell survey was rejected, I cannot agree. The paper on its face purports to be published at Santa Barbara, and it was first circulated in that county, and in my opinion a decision from these facts that said paper was published at San Francisco cannot be reached by an interpretation of the word 'published' in accordance with its usual and ordinary meaning, nor in .accordance with the proper interpretation of the word, as used in the act of June 14, 1860. The design of the publication prescribed by the act of 1860, was to convey to parties in interest notice that their claims had been surveyed, and to afford them an opportunity to file objections and contest said surveys; and that object was as well, if not better, accomplished by a publication in the manner stated than it could have been in any other manner under the peculiar circumstances surrounding the case. That would be sufficient to satisfy the requirements of the spirit of the law, but in my opinion the proceedings in the matter were also in strict conformity with the letter of the act of 1860. In Worcester's Dictionary, 'publication' is defined as 'the act of publishing or making public,' etc.; in Webster's Dictionary the same word is defined as 'the act of publishing or making known; notification to the people at large, either by words, writing, or printing;' in Bouvier's Law Dictionary 'publication' is defined as 'the act by which a thing is made public,' and 'publisher' as 'one who by himself or his agent makes a thing publicly known; one engaged in the circulation of books, pamphlets, and other 'papers;' and the same authority defines, 'printing' as 'the art of impressing letters; the art of making books or papers by impressing legible characters.' Many other authorities might be added, but these are considered sufficient to show the marked difference between the generally recognized meaning of the words 'published' and 'printed,' and sufficient also to show that the publication in the case under consideration was properly made under the law; for, while it is admitted that the Santa Barbara Gazette was printed at San Francisco, it is clearly shown that said paper was first 'made public to the people at large' (i. e., published) in the county of Santa Barbara.

"The remaining objections, as heretofore stated, to the publication of the Terrell survey are that said publication was not made in February and March, 1861, in the Los Angeles Star and Santa Barbara Gazette, as certified by the surveyor-general, but that the publication was made in September and October, 1860, in the Los Angeles Star and Pacific Sentinel, which publication was prior to the date when the plat and field-notes of said survey were approved, on the twenty-ninth day of January, 1861. In support of these allegations there is no evidence, except the affidavit of Mr. Ward, then owner of the rancho, and of John Nugent, one of Mr. Ward's counsel in the case. The first named does not positively admit that the survey of the Guadalupe, Diego Olivera et al., confirmees, was ever published, though he says a certain rancho, called 'Guadalupe,' was published; but Mr. Nugent, in effect, swears that as late as July, 1866, no plat and field-notes of the rancho under consideration were ever exhibited as the official plat and field-notes approved by Surveyor-General Mandeville, but one which had on its face a note showing said publication to have been made in September and October, 1860, in the Los Angeles Star and the Pacific Sentinel, and also showing the approval of said plat and field-notes to have been made in January, 1861. By this showing it would seem that, even admitting the facts set forth by the ranch owner and his attorney, the Guadalupe survey was final by publication so far as these objections are concerned, as the honorable secretary of the interior, in the case of the Rancho Tajauta. decided on the twenty-first of February, 1872, that a

publication by the surveyor-general that a certain survey had been approved was in itself a sufficient approval prior to publication to satisfy the requirements of the act of fourteenth of June, 1860, notwithstanding the plat bore upon its face an approval subsequent to said publication. But I am not satisfied of the correctness of the facts stated in said affidavits, for the record evidence of the surveyor-general's office and the district court contradicts said affidavits in every important particular; and let it be once established that the testimony, without cross-examination, of two interested witnesses shall be sufficient to overturn the certificates of three sworn officials of the government, two surveyors-general, and the clerk of a United States district court having jurisdiction in the matter, and the surveys of the numerous ranchos considered final by publication are no longer fixed upon that firm basis contemplated by the law. Nothing but the most clear and positive evidence ought to be admitted to set aside such a record, particularly when, as in this case, it was acquiesced in by the parties in interest, at the date when it was made, and for years thereafter. That the Guadalupe rancho, Diego Olivera et al., confirmees, was published in the Los Angeles Star and the Pacific Sentinel in September and October, 1860, is, in my opinion, not proven; neither is the insinuation in Mr. Ward's protest, that said rancho might have been mistaken for some other Rancho Guadalupe, entitled to any weight, for there is but one rancho of that name confirmed to Diego Olivera et al. in the state of California.

"A careful examination of the papers in the case upon which this office rejected the Terrell survey, and also the papers filed subsequent to such rejection, leads me to the conclusion that such action was erroneous, and that said survey was properly approved on the twenty-ninth of January, 1861, and published in the months of February and March of the same year in the Los Angeles Star and the Santa Barbara Gazette, and no objections thereto having been made within the time allowed by law, it became final by publication under the provisions of the act of congress, approved June 14, 1860 (12 Stat. 33). The patent executed in June, 1866, was therefore correctly executed, and is a good and valid patent for the rancho aforesaid, and is herewith transmitted for delivery to the party or parties properly entitled thereto. Said patent having been legally executed, the subsequent patent was without authority of law, and therefore void ab initio, and, being now in the possession of this office, will be canceled.

"You will give notice of this decision to all parties in interest, allowing sixty days from date of notice for appeal to the honorable secretary of the interior, at the expiration of which time, if appeal be taken, you will forward all the papers in the case, as in other cases of appeal; and if no appeal be taken, you will so notify this office.

"Very respectfully, Willis Drummond, Commissioner."

They also produced an indorsement of that commissioner upon the patent, declaring its cancellation. It is as follows: "Canceled, see decision dated June 12, 1872, of general land office, affirmed by the honorable secretary of the interior, March 26, 1873. Willis Drummond, Commissioner. General Land Office, April 10, 1873." For other facts, see Le Roy v. Clayton [Case No. 8,268].

Subsequently, on the twenty-third of the same month, this cancellation was revoked by order of the secretary of the interior, and the revocation is also indorsed upon the patent. The secretary states, in his communication to the commissioner, that the revocation was directed to enable the claimant to appear in court, and correct what he asserts to have been an error committed against his rights, and not for the purpose of revoking or altering the decision made. In connection with these documents, which were admitted subject to the objection of the plaintiff, the defendants produced another patent to the same parties, issued in June, 1866, which is referred to in the decision of Commissioner Drummond, and this patent, they contend, was the only valid patent which could be issued of the premises confirmed under the Mexican grant to Olivera and Arellanes, from whom the plaintiff deraigns his title. That grant was of a rancho or tract of land known by the name of Guadalupe. It was presented to the board of land commissioners in 1852, was confirmed by the board in 1853, and by the decree of the district court of the United States in 1857. This decree became final by stipulation of the attorney-general, abandoning an appeal taken from it to the supreme court of the United States.

In September, 1860, the claim thus confirmed was surveyed under instructions of the surveyor-general for California, by his deputy, Terrell, and the survey and plat of the premises were approved by him on the twenty-ninth of January, 1861. On the thirty-first of May following, that officer filed in his office a certificate to the effect that the rancho confirmed had been surveyed; and that the survey and plat were approved by him on the day mentioned; that he had, during the previous February and March, caused to be published once a week for four weeks successively, in two newspapers, to wit: the Santa Barbara Gazette, published in the county of Santa Barbara, and the Los Angeles Star, published in the city and county of Los Angeles, a notice that the land had been thus surveyed, and that the survey and plat had been approved by him; that the survey and plat were retained in his office during the four weeks, subject to inspection; and that no order for their return to the United States district court had been served

upon him. At the time the survey and plat thus mentioned were made, and this certificate was filed, J. W. Mandeville, Esq., was the surveyor-general of California. On the twenty-fifth of May, 1863, nearly two years after this paper was filed, Edward F. Beale, Esq., who was the successor in office, as surveyor-general, of Mandeville, transmitted to the commissioner of the general land office at Washington a copy of the plat of the tract surveyed, with the certificate contained in the above opinion of Commissioner Drummond, that he had caused the publication of notice that the survey of the tract had been made. in the Santa Barbara Gazette and Los Angeles Star, as stated in the certificate of his predecessor. The new surveyor-general evidently copied the language of his predecessor, and inadvertently ascribed to himself an act which could only have been done by that officer. Upon the transcript of the proceedings for the confirmation of the claim and this certificate of Surveyor-General Beale, a patent was issued from the general land office to the confirmees of the grant, on the thirtieth of June, 1866, signed by the president, under the seal of the United States, and recorded in the proper records of the land office. This patent was, in August, 1866, transmitted to the surveyor-general of California, to be delivered to the parties entitled to its possession. Immediately upon receiving notice of its issue, John B. Ward, at the time the owner of the premises, and entitled to the patent, refused to accept it, alleging that the survey of the premises did not conform to the decree of confirmation, and was not final under the act of 1860, as the requirements of that act with respect to publication had not been complied with. Soon afterwards, he presented to Commissioner Wilson, of the general land office, certain documentary evidence, to establish his allegations, accompanied with a petition that the patent might be recalled and a new survey ordered. That evidence showed that the Santa Barbara Gazette, in which publication was made, was printed and published in the city of San Francisco, and not in the county of Santa Barbara. The evidence at least satisfied the commissioner that the publication was not made in conformity with the law of 1860, and also, that the survey was erroneous. The patent of 1866 was accordingly recalled by him, and a new survey ordered, under the act of 1864. Such survey was made in 1867, and duly advertised; and was forwarded by the surveyor-general, with his approval, to the commissioner. Upon this survey a new patent was, on the eighteenth of March, 1870, issued to the same parties as the original patent, signed by the president under the seal of the United States, and recorded in the proper records of the land office. This patent was then forwarded by the commissioner by mail to the surveyor-general of California, for delivery to the party entitled to its possession. Some days afterwards, and before its arrival in California, the commissioner telegraphed to the surveyor-general to return the patent, and it was accordingly returned. Two years afterwards, in June, 1872, Commissioner Drummond, the successor of Commissioner Wilson, reviewed the latter's action, had in 1866, in directing the new survey, and his subsequent action in issuing a new patent, and, as shown by his decision above given, held that such action was without authority and void; that the Terrell survey of 1861 was conclusive, and accordingly directed a cancellation of the second patent, and in its place a delivery to the patentees of the recalled patent of 1866. Evidence was also given as to the boundary line dividing the grants upon which the two patents were issued, which is sufficiently stated in the opinion of the court. The case was held under advisement for some weeks, when judgment was rendered in favor of the plaintiff.

John B. Felton and Wm. H. Patterson, for plaintiff.

Gray & Haven, D. M. Delmas, and S. F. Lieb, for defendants.

FIELD, Circuit Justice. If the facts stated in the opinion of Commissioner Drummond annexed to the patent of 1870 cannot be considered as facts in evidence, there is nothing before the court impairing the validity of that patent. The indorsements on the copy produced show a revocation by the secretary of the cancellation directed by the commissioner; and if titles can be affected in this irregular way, can be divested and reinvested by indorsements of the officers of the land office upon its records, the revocation is of equal validity with the cancellation. The case, as thus presented, would be that of two patents to the same parties, the second covering a larger tract than the first, with the admission of counsel that the second was issued upon allegations by the owner of error in the survey of the premises covered by the first, and of its insufficient publication under the act of 1860. Without other knowledge on the subject we could not say that the second patent was invalid. Cases may often occur where a second patent would be necessary to prevent gross wrong to the patentee. If, for instance, a confirmation and a survey embraced three distinct tracts, and by mistake the survey returned and the patent issued covered only two of them, we do not see why, upon a proper presentation of the fact, and application of the claimant, the commissioner might not issue a second patent, either for the omitted tract or one embracing the three tracts together. The administration of the land department would be very defective if a mistake of this kind could not be remedied upon the consent of the parties before the acceptance of the patent had rendered the proceeding a closed transaction.

If, then, any consideration is to be given to the argument of counsel, that the second patent in the case was properly cancelled because the first patent was conclusive of the rights of the parties, the facts stated in that opinion must be treated as in evidence; they were apparently so regarded by counsel on the argument, and for the present we shall so treat them.

We are therefore required for the disposition of the case to consider the validity of the action of the two commissioners of the general land office;—that of Wilson in cancelling the patent of 1866 and issuing the one of 1870; and that of Drummond in annulling the action of Wilson and directing cancellation of the patent of 1870.

Previous to the act of June 14, 1860, the commissioner of the general land office exercised a general supervision and control of all executive duties relating to private claims to land and the issuing of patents therefor. Such authority was vested in him by the act of July 4, 1836, reorganizing the general land office. It necessarily embraced the examination of all surveys of such private claims and their correction until made conformable with the right conferred upon the claimant by legislative act or judicial decree. The surveys of private land claims under Mexican grants in California, were thus subject to his control. He was invested with this necessary power to prevent the consequences to individuals, as well as to the public, of accident, inadvertence, irregularity or fraud. Castro v. Hendricks, 23 How. [64 U. S.] 443. His duty in these cases was to compel conformity in the survey made with the decree of confirmation, where that contained a description of the land sufficiently specific to guide the surveyor, but if it contained no such description, then to compel a survey in a compact form, so far as such compactness was consistent with the natural features of the country, and the previous selection of the confirmee as shown by his residence, cultivation and sales. This authority of the commissioner continues under the act of 1864. But by the act of 1860, and so long as that act was in force, his power in this respect was withdrawn.

That act established a system by which all surveys, when made pursuant to its requirements, and advertised in a certain way, became so far final as to leave to the commissioner the simple ministerial duty of issuing a patent thereon. It provided that the surveyor-general, when he had caused, in compliance with the thirteenth section of the act of 1851, a private land claim to be surveyed, and a plat thereof to be made, should give notice that the same had been done, and that the plat and survey were approved by him, by publication once a week for four weeks in two newspapers, one of which was to be in a paper "where the place of publication was nearest to the land," and the other in a paper published in San Francisco, if the land was situated in the Northern district of California, and in Los Angeles, if situated in the Southern district. The act also provided that, until the expiration of the publication, the survey and plat should be retained in the surveyor-general's office subject to inspection; that upon the application of any party whom the district court or a judge thereof, should deem to have such an interest in the survey and location of a land claim, as to make it just and proper that he should be allowed to intervene for its protection, or on motion of the United States the district court should order the survey and plat to be returned into court for examination and adjudication; that when thus returned notice should be given by public advertisement, or in some other form prescribed by rule, to all parties interested, that objection had been made to the survey and location and admonishing them to intervene for the protection of their interests; that such parties having intervened might take testimony and contest the survey and location, and that on hearing the allegations and proofs, the court should render its judgment approving the survey, if found to be accurate, or correcting or modifying it, or annulling it and ordering a new survey, if found to be erroneous, and generally to exercise control over the survey until it was made to conform to the decree of confirmation.

And the act then declared that when after publication, as thus required, no application was made for an order to return the survey into court, or the application was refused, or if granted the court had approved the survey and location, or reformed or modified it and determined the true location of the claim, it should be the duty of the surveyor-general to transmit, without delay, the plat or survey of the claim to the general land office; and that the patent for the land, as surveyed, should forthwith be issued therefor; and that "the plat and survey so finally determined by publication, order or decree," as the same might be, should "have the same effect and validity in law, as if a patent for said land so surveyed had been issued by the United States." It is plain, from this language, that it was the intention of congress to withdraw from the commissioner the supervision and control of surveys subsequently made of private land claims under Mexican grants in California.

But there was still a duty resting upon that officer. To render the survey final, when not subjected to the judgment of the district court (which acquired jurisdiction by a return to it of the survey), it was necessary under the act, as already seen, that the publication required should be made. This was an essential prerequisite to its finality; nothing else could be substituted for it. And though in issuing a patent upon a survey when final, the commissioner had a mere ministerial duty to perform, there was this preliminary duty cast upon him to see that the necessary publication had been made. The certificate of the surveyor-general was evidence of this fact, but it was only prima facie evidence; un-

questioned, it might be taken as conclusive; when questioned, the commissioner could go behind it. The documents presented to him disclosed the fact that no publication of notice of the Terrell survey had been made in a paper published nearest the land. They allege that the Santa Barbara Gazette was, in January and February, 1861, published in the city of San Francisco, and not in the county of Santa Barbara, which is distant several hundred miles from that city. Of these documents one was an affidavit made by a person employed upon the Gazette, and the other by a subscriber to the paper. Both of them were made upon personal knowledge, and were positive in their character. And yet an affidavit of the widow of one of the publishers of the paper, made four years afterwards, that the Santa Barbara Gazette, though printed in San Francisco between January and October, 1861, was sent as soon as printed to Santa Barbara for distribution, was considered by Commissioner Drummond six years afterwards, sufficient to overthrow these allegations. This distribution constituted, according to his judgment in reversing the action of his predecessor, the publication of the paper in that county within the meaning of the act of congress.

Assuming for the present that Commissioner Drummond possessed at the time authority to annul the action of his predecessor, if deemed erroneous, we do not agree with him in his conclusion as to the sufficiency of the publication. It was not alleged in the affidavit of the widow, and it could not be presumed from the mere heading of the paper, admitted to be printed elsewhere, that the entire issue was sent to Santa Barbara, though intended principally for circulation there. Certainly, a presumption of the kind was very slight ground upon which one public officer could undertake to set aside the deliberate act of his predecessor, had years before, upon which rights of property rested. The statute says that the notice must be published in a paper where the place of its publication is nearest the land, not where the place of its distribution is nearest. In one sense, a paper is published in every place where it is circulated, or its contents are made known. But it is not in that general sense that the language, "place of publication," in the statute is used. That language refers to the particular place where the paper is first issued, that is, given to the public for circulation. Nearly all the great dailies published in the city of New York are distributed in different parts of the country. Large packages of these papers are daily made up and immediately transmitted to California, where the packages are opened and the papers distributed. A large number of them in this mode, no doubt, find their way to the county of Santa Barbara; yet it would do violence to our apprehension of the term to say that these papers are published in Santa Barbara, in the sense of the statute. No one so

understands the term in ordinary parlance, and it is not used in the statute in any technical sense.

But there is disclosed in the opinion of Commissioner Drummond, another fact, which makes it clear that no sufficient or legal publication was made, and that is, that the notice published omits the material statement required by the statute, that a survey and plat of the claim confirmed had been made and approved by the surveyor-general. All that is stated in the notice is that the surveyor-general had examined and approved of the Rancho Guadalupe, confirmed to Olivera and others, and that the plats would be retained in his office, subject to inspection, for four weeks from the date of the publication. A party might perhaps reasonably infer that reference was thus intended to some survey of the land, but he would not be obliged to take notice from the statement that the surveyor-general had caused a survey and plat to be made, or had approved of one made by others under his directions.

The commissioner appears to have given controlling weight, in overruling the action of his predecessor, to the certificates of Surveyors-General Mandeville and Beale, and of a clerk of the United States district court. The certificates were only prima facie evidence, and before the patent was issued, and afterwards, if the patent was properly recalled, the commissioner was at liberty to go behind them, and inquire whether notices had been in fact published, as there stated. The certificate of Surveyor-General Beale, as to the publication, was of matters not within his personal knowledge. And the same may be said of the certificate of the clerk, so far as the acts of the surveyor-general and his publications were concerned; as to them it was without any value whatever. The clerk can certify to copies of papers and orders in his office; also, perhaps, to the absence of papers and orders in particular cases, but that is the extent of his authority. His certificate would have been just as valuable as evidence had it related to the acts of the commissioner himself, and yet the commissioner twice refers to it as having some potentiality in the matter.

But aside from all considerations of this kind, the case cannot be disposed of by any judgment we may form of the evidence which controlled Commissioner Wilson. We have commented upon that evidence because, upon its supposed insufficiency, Commissioner Drummond justified his attempted annulment of the action of his predecessor and the cancellation of the second patent. If the patent of 1866 could be recalled at all, the sufficiency of that evidence is not a subject for consideration in this form of action, any more than the sufficiency of the evidence upon which any other step in the progress of the proceeding for a patent was taken. As we have already stated, it was the duty of the commissioner, upon receiving a survey transmitted to him as published, under the act of 1860, to

examine into the regularity and sufficiency of the alleged publication. That was a matter submitted by the law to his determination; and that determination, whether correctly or erroneously made, was conclusive, unless reviewed and corrected on appeal by his superior, the secretary of the interior. The commissioner has undoubtedly a right within a reasonable period, upon proper application, to reconsider any matter previously determined by him, but such right must be exercised before proceedings upon the original ruling have been taken and concluded. It would be a dangerous doctrine, creating great insecurity in titles, if the correctness of his action upon a matter over which he has jurisdiction could years afterwards be annulled by his successor, because of supposed errors of judgment, upon the sufficiency of evidence presented to him. And it would be without precedent and against principle for a court of law, in an action of ejectment upon a patent, to inquire collaterally into the sufficiency of such evidence to justify the action of the commissioner, and to submit that question to the determination of a jury. The patentee, if such a proceeding were permissible, would find his title established in one case and rejected in another, according to the varying judgment of different juries.

It becomes important, therefore, to determine when a patent of the United States for land takes effect, that is, when it becomes operative as a conveyance and binding upon both parties; and under what circumstances it may be recalled after it has passed under the seal of the United States, and been recorded. Some confusion has arisen in the consideration of this subject from not distinguishing between acts which bind the government, and acts which bind the patentee. It has been assumed, rather than stated, both in judicial decisions and in the argument of counsel, that when the government is bound, the patentee is bound also, without reference to his assent on the subject; but nothing is farther from the fact. No one can be compelled by the government, any more than by an individual, to become a purchaser, or even to take a gift. No one can have property, with its burdens or advantages, thrust upon him without his assent. In order, therefore, that the patent of the government, like the deed of a private person, may take effect as a conveyance, so as to bind the party to whom it is executed, and transfer the title to him, it is essential that it should be accepted. As the possession of property is universally, or nearly so, considered a benefit, the acceptance by the grantee of the conveyance transferring the title, where no personal obligation is imposed, whether the conveyance be a patent of the government or the deed of an individual, will always be presumed in the absence of express dissent, whenever the conveyance is placed in a condition for acceptance. There is in this respect no difference between the patent of the government and the deed of a private individual.

The question then, in all cases is, when is the conveyance in a condition for acceptance by the grantee? What act of the grantor is necessary to place the instrument in a condition for acceptance? When in that condition its operation is no longer subject to the control of the grantor; that then depends upon the grantee. The answer to the question is not difficult. If the instrument be the deed of a private individual it is in a condition for acceptance when it is offered for delivery, that is, when the grantor has parted with its possession or the right to retain it, in order that it may be given to the grantee. Jackson v. Dunlap, 1 Johns. Cas. 116; Jackson v. Phipps, 12 Johns. 418; Jackson v. Bodle, 20 Johns. 184; Church v. Gilman, 15 Wend. 656; Hulick v. Scovil, 4 Gilman, 159; Bullitt v. Taylor, 34 Miss. 741. If the instrument be the deed of the government, that is its patent, it is in that condition when the last formalities required by law of the officers of the government are complied with. Those formalities consist in passing the instrument under the seal of the United States, and in recording it in the records of the land office. By these acts, open and public declaration is made that so far as the general government is concerned, the title of the premises has been transferred to the grantee. The record stands in the place of the offer for delivery in the case of a private deed; the instrument is then in a condition for acceptance, and is thenceforth held for the grantee. And so the authorities are, that the grantee in such case takes by matter of record, the law deeming, as says Mr. Justice Story, speaking for the supreme court, "the grant of record of equal notoriety with an actual tradition of the land in view of the vicinage." Green v. Liter, 8 Cranch [12 U. S.] 247.

In case of a private deed, it is essential that the grantor should part with its possession or the right to retain it, for until then he may alter or destroy it. But not so with the government deed; with the close of the record the power of the officers of the government over the instrument is gone. Whether it thereafter remain in the land office or be transmitted to a local officer for manual delivery to the patentee, its validity and operation are unaffected. Its acceptance by the grantee will then be conclusively presumed, unless immediately upon knowledge of its issue, his refusal to accept it is explicitly declared, and such refusal is communicated to the land office.

But assuming the correctness of this doctrine in cases of ordinary transfers by the government of property by sale or gift, it is argued by counsel that it has no application to patents issued upon a confirmation of Mexican grants in California. The argument is, that the government, in dealing with claims to land under these grants, acts

as a sovereign over a subject within its exclusive jurisdiction; and, that in the discharge of its treaty obligations, it has declared in what manner such claims shall be presented; by what officers their validity shall be tested and location determined, and by what document the result of the proceedings, when favorable to the claimant, shall be authenticated. The patent, it has declared, shall be issued by the commissioner when its tribunals have adjudged that the claim is valid, and its officers have correctly surveyed it. The claimant, say the counsel, cannot prevent the agents of the government from performing the duties which the law has imposed upon them. He is as powerless to prevent the issue of the patent as he was to annul the survey or control the decree. The law commands the commissioner to issue the patent, and with the discharge of that duty the confirmee cannot interfere. No act of the latter can enlarge or abridge the commissioner's powers. And hence the efficacy of the patent in these cases does not depend upon the acceptance of the patentee.

The argument is plausible, but not sound; it proceeds upon the assumption that an acceptance of the patent must be by assent subsequent to its issue. But subsequent assent is not essential. A previous application for a patent is as persuasive evidence of its acceptance as any subsequent assent; that is, if the patent conforms to the application. Patents issued upon confirmation of Mexican grants in California are of this character. To obtain them is the object of the proceedings instituted under the act of 1851. The claimant asks in effect that his claim may be recognized and confirmed by an appropriate decree; that then a survey conforming to such decree may be made in the mode prescribed by law, and that a patent thereupon be issued to him. When a patent is thus issued it will take effect without reference to any subsequent action of the patentee. He has in advance, by his proceedings, signified his acceptance. But on the other hand, if the patent in such case be issued without a final survey, that is, one determined in the prescribed mode to be conformable to the decree, its acceptance cannot be conclusively presumed, from the fact that the patentee instituted the proceedings for the confirmation of his claim. He asked what the law authorized him to have, and so far as the law is disregarded in the survey he stands free as to his acceptance of the result. He can in such case, by prompt expression of dissent, communicated to the proper department, prevent the patent becoming so far binding upon him as to preclude a re-examination of the survey as to the errors alleged.

Such was the case with the patent of 1866; it was issued upon the supposition that the survey had become final by proper publication. The owner of the claim insisted that no such publication had been made, and that the survey was not therefore final and binding upon him, and was in fact erroneous, and on that ground refused at once to accept the patent, and asked for a new survey. The commissioner of the general land office was, upon this refusal and petition, at liberty to look again into the alleged finality of the survey, that is, into the sufficiency of the publication, for on no other ground than its insufficiency could he depart from the survey returned. The proceeding was one between the patentees and the government, and if the patentees, before accepting the patent, consented that the regular officer of the government might go behind the record and re-examine the matter which had been by law intrusted to him, and correct an error which had been committed, by accident, inadvertence, or otherwise, we do not perceive how any third party can object, and assail the second patent on that ground. If the defendants, or other third parties, have superior rights to those of the patentees, they are no more affected by the correction of the error in the survey than they would have been had the error never been committed. And if they have no such superior rights they cannot, upon any just principle of law or morals, contend that the error committed to the injury of the patentees or their successor in interest, shall be for ever irreversible. This is not a case where any doctrine of estoppel for alleged acts or conduct of the parties applies.

The proceeding is not in principle essentially different from the correction of a deed of a private person. If the deed is accepted when tendered, the transaction is closed; the title has passed, and any subsequent alteration of the instrument, or its destruction, cannot affect the grantee's title. But if not accepted when tendered, the deed may be corrected by the grantor, until it meets the views of the grantee. The only difference between the two cases arises from the fact that whilst the individual grantor is not restricted in his alterations, the officers of the government, acting under the law, can only, even by consent of the patentee, go behind the record to correct an error committed to his injury in disregard of rights secured to him by the law. The Terrell survey not having become final, and the commissioner being satisfied that it was erroneous, a new survey was properly ordered, under the act of 1864, which was then alone applicable. It is conceded that the subsequent proceedings, including the issue of the patent of 1870, were in accordance with its provisions. Our conclusion is, that the patent of 1866 was lawfully recalled, and that the patent of 1870 was properly issued, and is a valid instrument, binding both upon the government and the patentees and their successor in interest. After it was recorded, the officers of the government were powerless to change it or cancel it, without the

consent of its owner. It was then his muniment of title, and he was entitled to its possession whenever demanded.

The grant, upon which the patent held by the defendants is founded, was of a rancho known as "La Punta de la Laguna," adjoining the Rancho Guadalupe. It was presented to the board of land commissioners in 1852, was confirmed by that tribunal in 1854, and by the decree of the district court of the United States in 1857. This decree, like that in the Guadalupe case, became final by stipulation of the attorney-general, abandoning an appeal taken from it to the supreme court of the United States. In September, 1860, the claim confirmed was surveyed, under instructions of the surveyor-general for California, by the same deputy who surveyed the Guadalupe rancho, and the survey and plat were approved, as in that case, on the twenty-ninth of January, 1861, and a similar certificate of publication of notices of the survey and plat, in the same papers, and for the same period, was filed by the surveyor-general, on the thirty-first of May, 1861. From some unexplained cause, the survey and plat do not appear to have been forwarded to the general land office, for a patent, until 1873, for the certificate of the original by the surveyor-general, incorporated into the patent, is dated in July of that year. The patent, as already stated, was issued in October, 1873. Whatever defect existed in the publication of notices of the survey and plat, in the Santa Barbara Gazette, in the Guadalupe case, existed in this case. No objection, however, appears to have been taken before the general land office on that ground, and objections to the survey of that character were obviated by the acceptance of the patent. The demanded premises are covered by this patent. We have, then, the case of two patents regularly issued, each embracing the land in controversy. We must, therefore, look behind them, to the original grants, to ascertain which of them carried the better right to the premises. As already said, they adjoin each other; the eastern line of one is the western line of the other. If we can find this line, the difficulty is, of course, solved. The grant of the Guadalupe rancho only designates generally the location of the land, without giving any specific boundaries, but in April, 1840, which was the month following its issue, possession was officially delivered to the grantee by the magistrate of the vicinage, a proceeding necessary, under the law of Mexico, to a complete investiture of title, and called, in the language of the country, juridical possession. This proceeding involved a measurement of the land, and its segregation from the public domain. A record of the proceeding, showing the measurement and the boundaries established, was made, and a copy is produced in evidence.

The grant of the Rancho La Punta de la Laguna describes the land granted as bounded by various designated ranchos. In January, 1845, juridical possession of these premises was also given to the grantees by a magistrate of the vicinage. A record of this proceeding was also preserved, and a copy is in evidence. These records were before the land commission, and the United States district court when the grants were confirmed, and in the decrees of confirmation the boundaries there given are followed.

If, now, we look at the decree in the case of the Rancho of La Punta de la Laguna, we find the dividing line between it and the Rancho Guadalupe thus described: "Commencing on the top of the Lomas de la Larga, and running northerly over the plain, crossing the middle of the laguna, the distance of ten thousand two hundred varas to the Cuchillo de Nipomi, where two roads ascend, and where a stake was driven as a boundary." The different objects here stated have all been identified. The position of the top of the Lomas de la Larga is admitted to be at a live oak marked on the survey; the laguna, of course, lies where it always did; and the point where the stake mentioned was driven has been shown. The line thus given is the one laid down in the new survey of the Guadalupe rancho upon which the patent of 1870 was issued. We are satisfied that it is the true line. It would serve no useful purpose to go minutely into an examination of the evidence presented against this view. It is sufficient to observe that it has not created any serious doubt in our minds as to the correctness of this line. This conclusion disposes of the question of conflict of boundaries.

It is admitted that the defendants, except such as disclaimed, were in the possession of the premises in controversy at the commencement of the action; but there is no evidence of their possession at any previous period. There is, therefore, no basis laid for the recovery of any other than mere nominal damages for the alleged previous possession; and none, accordingly, will be awarded.

The plaintiff must have judgment for the possession of that portion of the demanded premises which is covered by the patent of 1870, with one dollar damages. Counsel for the plaintiff will, within ten days, prepare special findings in the case, and submit them to the court for settlement, upon notice to the counsel of the defendants; otherwise, a general finding will be filed.

[For another case by the same plaintiff in the same court, decided by Circuit Judge Sawyer, in which he sustains the patent of March 1, 1870, against defendants claiming under preemption, see Case No. 8,268.]